J-A30043-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.O.R. AND M.M.R., MINOR CHILDREN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: O.R., FATHER | : | No. 808 MDA 2016 |

Appeal from the Decree April 13, 2016
in the Court of Common Pleas of Berks County
Orphans' Court at Nos:  83862, 83863

BEFORE:  BOWES, OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED DECEMBER 12, 2016**

O.R. ("Father") appeals from the decrees entered April 13, 2016, in the Court of Common Pleas of Berks County, that involuntarily terminated his parental rights to his minor son, E.O.R., born in October of 2008, and to his minor daughter, M.M.R., born in July of 2011 (collectively, "the Children").[1]  After careful review, we affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

> This family came to the attention of [Berks County Children and Youth Services ("BCCYS")] []as the result of two reports in the two days following M.M.R.'s birth in July 2011 and

---

[1] The orphans' court entered separate decrees terminating the parental rights of the Children's mother, A.M.R. ("Mother"), that same day.  Mother has not filed a brief in connection with this appeal, nor has she filed her own separate appeal.

a third report on August 15, 2012. The reports were made as a result of Mother's drug use, mental health issues, lack of compliance with parenting services, and residential transiency, as well as Father's criminal history.

Father was first incarcerated as a result of charges incurred in April 2008, six months prior to E.O.R.'s birth, for possession with intent to deliver. At the time of the offense, he knew Mother was pregnant. He was incarcerated for 13 months on a two to four year sentence because he was boot camp eligible. Father testified that the next criminal charge he had was in December 2011 for drug possession and a firearm charge, though his incarceration may have been due to a parole violation. During his incarceration, Father's plan for preserving the family unit was to have the Children returned to Mother despite knowing the risks and danger that she posed to them. He provided money to her so that she could stabilize herself by getting an apartment for herself and the Children, but she used it to get an apartment for herself and another man.

Father was released from jail on September 14, 2012. Father reported that he was still on parole and out on bail for the pending charge of carrying a firearm without a license and possession of drug paraphernalia.

Father began visiting the Children, who were being cared for by their maternal grandmother. The maternal grandmother had issues of her own, including a drug history and an unsanitary residence. On October 19, 2012, the maternal grandmother requested that Father immediately take the [C]hildren because she could no longer care for them. Following a safety conference, the Children were permitted to remain in Father's care.

The Children were well cared for by Father; however, BCCYS learned that Father permitted Mother and maternal grandmother to have contact that was not permitted under the December 12, 2012 Family Plan. A Safety Plan was implemented on April 30, 2013[,] that allowed Mother to have visits with the Children through approved providers only.

At a July 10, 2013 dependency hearing, the [orphans' c]ourt declared the Children dependent but allowed physical custody to remain with Father. Due to Father's pending criminal

- 2 -

charges, safety conferences were scheduled to establish a plan for the Children's care as the circumstances might require, but Father failed to participate. On August 29, 2013, BCCYS obtained emergency custody of the Children because Father had been incarcerated on August 23, 2013[,] and his mother, with whom Father left the Children, did not have the resources to provide for their appropriate care.

Orphans' Court Opinion, 5/25/16, at 4-5.

On September 29, 2014, BCCYS filed petitions to involuntarily terminate Father's parental rights to the Children. The orphans' court held a termination hearing on April 11, 2016. Following the hearing, on April 13, 2016, the court entered decrees terminating Father's parental rights. Father timely filed *pro se* notices of appeal on May 9, 2016.[2, 3]

Father now raises the following issues for our review:

1) Did the [orphans' c]ourt err[] in granting BCCYS's Petition to Involuntarily Terminate the Parental Rights of Biological Father under 23 Pa. C.S.[A.] § 2511 (a) (1), (2), (5), (8), and (b)?

---

[2] Father was represented by counsel during the termination hearing. On May 5, 2016, Father's prior counsel filed a motion to withdraw, in which she averred that Father wished to proceed *pro se*. The orphans' court granted prior counsel's motion to withdraw by order entered May 16, 2016. Father is represented by new counsel on appeal, although the record does not reveal when Father's current counsel was appointed.

[3] Father failed to file concise statements of errors complained of on appeal at the same time as his *pro se* notices of appeal, as required by Pa.R.A.P. 1925(a)(2)(i). However, Father later filed an additional *pro se* notice of appeal on May 23, 2016, which included a concise statement of errors complained of on appeal. We have accepted Father's concise statement pursuant to **In re K.T.E.L.**, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party).

2) Did BCCYS[] fail to provide the biological father with reasonable efforts [to] promote reunification and/or fail to act on the behalf of the [C]hildren's best interest pursuant to 42 Pa. C.S.A. § 6351 (a) (2.1.) and (f)[?]

3) Did [Father] suffer from ineffective assistance of counsel?

Father's Brief at 9.

Father's first and second issues are interrelated, so we address them together. In his first issue, Father argues that the orphans' court erred by involuntarily terminating his parental rights to the Children. In his second issue, Father argues that BCCYS failed to provide him with reasonable reunification efforts. Father further contends that the court should have placed the Children in permanent legal custodianship or subsidized permanent legal custodianship ("PLC/SPLC") rather than terminate his parental rights.

We consider these claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need agree with the orphans' court as to only one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and Section 2511(b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2) and 2511(b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the

- 6 -

contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the orphans' court found that while Father has attempted to remain involved in the Children's lives, he is incapable of providing the Children with the essential parental care, control, and subsistence necessary for their physical and mental well-being. Orphans' Court Opinion, 5/25/16, at 7. Further, the court found that Father will not be able to remedy his parental incapacity in the near future, and that, even after his release from incarceration, Father will have "much to prove" in order to demonstrate that he is capable of caring for the Children. *Id.* The court concluded that "[i]t is not fair to [the Children] to hold their lives, their development, their potential, their stability, and their welfare generally in limbo" until Father is able to resume performing parental responsibilities. *Id.*

Father argues that he participated in various programs and services while incarcerated, and that he has maintained regular contact with the Children. Father's Brief at 14, 18. Father insists that he demonstrated an

- 7 -

ability to care for the Children prior to his current incarceration. *Id.* at 15-17. According to Father, he will have housing available upon his release, and will be able to obtain employment quickly and resume performing parental responsibilities. *Id.* at 18-19.

In addition, Father argues that BCCYS failed to provide him with reasonable reunification efforts. Father acknowledges our Supreme Court's holding in *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), *i.e.*, that failure to provide reasonable reunification efforts does not preclude termination of parental rights. Father's Brief at 24. Nonetheless, Father contends that "a lack of assistance by BCCYS to [Father] is relevant to whether [F]ather's incapacity cannot or will not be remedied[.]" *Id.* (citation and quotation marks omitted). Father does not specify what services BCCYS allegedly failed to provide, but claims that BCCYS "interfered with all of [his] efforts," and "failed to provide further a chance [*sic*] to remedy the conditions" causing the Children to be placed in foster care. *Id.*

After carefully examining the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children. During the termination hearing, BCCYS presented the testimony of caseworker, Ruth George. Ms. George testified that Father has remained incarcerated throughout the Children's placement in foster care. N.T., 4/11/16, at 31. Father participated in various programs and services during his incarceration, and Ms. George

believed that Father did about all he could do while in prison. *Id.* at 31-32. Despite these efforts, Ms. George recommended that Father's parental rights be terminated. *Id.* at 32. Ms. George emphasized Father's lengthy history of incarceration, and the Children's need for "somebody they can depend on." *Id.*

Ms. George further testified that, even if Father were released from incarceration in the near future, he still would need to obtain housing and employment in order to care for the Children. *Id.* at 42. Father would need to demonstrate that he is capable of staying out of prison, and BCCYS would need to "mak[e] sure that there's appropriate care-taking capabilities and a plan for the care of the [C]hildren and meeting their special needs." *Id.* Ms. George estimated that this process would take approximately "nine months to a year." *Id.*

Father testified that he would be meeting with the parole board shortly after the termination hearing. *Id.* at 47. Father stated that it usually takes the parole board about four to eight weeks to reach a decision, and that he hoped to be released in the next few months. *Id.* at 47-48. Father indicated that, if released, he would have a year of state parole left to serve, as well as six years of county probation. *Id.* at 55-56. Father reported that after being released he would stay at his grandmother's house and seek employment so that the Children could be returned to his care. *Id.* at 48.

Accordingly, the record supports the finding of the orphans' court that Father is incapable of parenting the Children, and that Father cannot, or will not, remedy his parental incapacity. As discussed above, Father has been in and out of prison since 2008. Most recently, Father spent about one year caring for the Children, from September of 2012 to August of 2013. **See id.** at 46. At the time of the termination hearing, the Children had been in foster care for over two and a half years, from August of 2013 until April of 2016, and it was not clear when, if ever, Father would be able to care for them again. Even assuming that Father is released at the earliest possible opportunity, it would take nearly another year in order for Father to be considered a placement resource for the Children. This is simply unacceptable. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006).

With respect to Father's claim that BCCYS failed to provide him with reasonable reunification efforts, Father is correct that "a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity cannot or will not be remedied by the parent." **In re D.C.D.**, 105 A.3d at 672 (citation and quotation marks omitted). However, Father has

- 10 -

failed completely to explain what other efforts BCCYS could have made that would have enabled him to be reunited with the Children. Clearly, BCCYS could not prevent Father from being incarcerated, nor could it cause him to be released from incarceration any earlier. The record confirms that Father's parental capacity is entirely of his own making, and that BCCYS was powerless to remedy this incapacity through the provision of additional services.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 11 -

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

Here, the orphans' court found that the Children's primary parental

bond is with their foster parents, and that the Children "have an 'uncle' type

bond with Father." Orphans' Court Opinion, 5/25/16, at 6. The court

emphasized the testimony of the bonding evaluator, psychologist Richard F.

Small, Ph.D., who opined that it would be more detrimental for the Children

to be separated from their foster parents than from Father. *Id.* The court

concluded that, "[w]hile it might be nice, [the Children] do not need contact

with Father." *Id.* at 7. In contrast, the court stressed that the Children do

need permanency, as well as the parental care that can be provided to them

by their foster parents. *Id.*

Father insists that the Children are more strongly bonded to him than

to their foster parents, and challenges the contrary opinion presented by Dr.

Small. Father's Brief at 20-21. Father argues that Dr. Small contradicted

himself by indicating in his bonding evaluation report that the Children are

strongly bonded to Father, but then testifying during the termination hearing

that Father and the Children do not share a strong bond. *Id.* Father argues

that Dr. Small also contradicted himself by indicating in his report that the

Children's bond with their foster parents could be severed with little harm to

the Children, but then testifying that severing this bond would be highly

detrimental. *Id.* at 21. Father contends that the orphans' court should have placed the Children in PLC/SPLC, rather than terminate his parental rights, in order to preserve the bond between Father and the Children. *Id.* at 23-26.

We again conclude that the orphans' court did not abuse its discretion. Dr. Small conducted a forensic bonding evaluation with respect to the Children in October of 2015. N.T., 4/11/16, at 18-19. As part of the evaluation process, Dr. Small met with the Children, as well as their foster parents, their paternal great-grandmother, and Father. *Id.* at 19. Dr. Small summarized his conclusions in a bonding evaluation report, which was admitted into evidence as Exhibit 60. *Id.* at 29. In his report, Dr. Small concluded that the Children have "a strong bond" with Father and their great-grandmother, and an "excellent bond" with their foster parents. Exhibit 60 at 6. Dr. Small opined that it would be "detrimental" to sever the bond between the Children and Father. *Id.* Dr. Small further opined that it would be possible to sever the bond between the Children and their foster parents with little harm, "[i]f, in fact, [the Children's great-grandmother] and [Father] were immediately able to form a predictable, stable environment[.]" *Id.* However, Dr. Small cautioned that Father "would not be even available to form a stable environment for another six months, during which time the bond with the [foster parents] is likely to grow stronger. Severing it would likely be increasingly detrimental as time passes." *Id.*

During the termination hearing, Dr. Small testified that the Children's bond with their foster parents is their primary, parental bond. N.T., 4/11/16, at 20. Concerning the Children's relationship with Father, Dr. Small opined, "[M.M.R.] seemed to see her father as a nice benign figure. [E.O.R.] it's almost like he's a nice uncle, he's somebody that they like seeing, they enjoy seeing, but isn't necessarily the person raising them." *Id.* Dr. Small acknowledged that it would be "detrimental" to end the Children's relationship with Father, but clarified that "[d]etrimental doesn't mean horrible." *Id.* at 21. Dr. Small reasoned that the bond the Children share with their foster parents is more important than the bond they share with Father, and that it would be "highly detrimental" for the Children to be separated from their foster parents. *Id.* at 21-22. Ultimately, Dr. Small recommended that the Children remain with their foster parents, while having "occasional" contact with Father and great-grandmother. *Id.* at 24, 26.

Thus, the record confirms that terminating Father's parental rights would best serve the needs and welfare of the Children. Our review of Dr. Small's bonding evaluation report does not reveal any significant differences between the report and Dr. Small's testimony during the termination hearing. While Father is correct that Dr. Small's bonding evaluation report arguably does differ slightly from his testimony, it was for the orphans' court, not this Court, to assess these possible discrepancies and determine

- 14 -

how much weight, if any, to place on the opinions of Dr. Small. The orphans' court was free to accept the testimony of Dr. Small that the Children's most important bond is with their foster parents, and that Father is more of an "uncle" to the Children than a parent.

Further, we reject Father's claim that the orphans' court should have placed the Children in PLC/SPLC rather than terminate his parental rights. According to Ms. George, Father has requested that the Children be placed in the permanent legal custody of their foster parents. N.T., 4/11/16, at 34. However, Ms. George explained that BCCYS is opposed to placing the Children in PLC/SPLC because "[t]he [C]hildren are too young. That is primarily for children who are age 12 and over. These children need permanency." *Id.* at 34-35. It was within the discretion of the orphans' court to accept the testimony of Ms. George, and to conclude that the Children's needs and welfare would be better served by achieving permanency through adoption, rather than leaving the Children in the limbo of PLC/SPLC.

Finally, we address Father's claim that his prior counsel provided ineffective assistance during the termination proceedings.

> The unique nature of parental termination cases has long been recognized by the Supreme Court of Pennsylvania. Thus, *In re Adoption of R.I.,* 455 Pa. 29, 312 A.2d 601 (1973), the Supreme Court held that an indigent parent in a termination of parental rights case has a constitutional right to counsel. The right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature. However, this right is more limited than that in criminal

- 15 -

cases, as claims of ineffective assistance of counsel must be raised on direct appeal. We then review the record as a whole to determine whether or not the parties received a fundamentally fair hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was the cause of the decree of termination.

*In re J.T.*, 983 A.2d 771, 774-75 (Pa. Super. 2009) (some citations and quotation marks omitted).

Here, Father claims that his prior counsel, Kelly Kline, Esquire, was ineffective because she failed to file a petition requesting that the Children be placed in PLC/SPLC, failed to argue before the orphans' court that PLC/SPLC was an option, and "failed to . . . raise numerous issues that [Father] has raised [i]n his brief[.]" Father's Brief at 29. Additionally, Father suggests that his counsel prior to Attorney Kline, Susan Quirits, Esquire, was ineffective by failing to "subpoena Kimberly Reinert (BCCYS In Home Case Worker), who could discuss [F]ather's conduct during his release on bail, prior to his incarceration." *Id.* at 29-30.

Father is not entitled to relief, as it is apparent that Attorney Kline's failure to request PLC/SPLC was not the cause of the decree terminating his parental rights. To the contrary, the record demonstrates that it was Father's lengthy history of incarcerations, and the slim chance that he would be able to resume caring for the Children at any point in the foreseeable future, that caused Father's parental rights to be terminated. As discussed above, the orphans' court clearly was aware that PLC/SPLC was an option in this case. It was within the court's discretion to accept the testimony of Ms.

George that placing the Children in PLC/SPLC was inadvisable given their young age, and that it would better serve the Children's needs and welfare to be adopted.

Further, Father fails to specify in his brief what other "numerous issues" he believes Attorney Kline could have raised, or why he believes these issues would have changed the outcome of the termination hearing. Father also fails to explain how the failure of Attorney Quirits to subpoena Ms. Reinert could possibly have had any impact on the result in this case. That Father did a competent job of caring for the Children prior to his incarceration is not in dispute. *See* Orphans' Court Opinion, 5/25/16, at 4 ("The Children were well cared for by Father[.]"). Moreover, Father's short-lived success as a parent three years ago does not change the fact that he remained incarcerated at the time of the termination hearing, and that it was unclear when, if ever, Father would be able to parent the Children again.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children. We therefore affirm the court's April 13, 2016 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/12/2016